IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. JEREMIAH T.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JEREMIAH T., APPELLANT.

Filed April 22, 2025.   No. A-24-815.

Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge. Reversed and remanded with directions.

Jason E. Troia, of Jason Troia Law, for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

### INTRODUCTION

Jeremiah T. was 15 years old (10th grade) at the time he was alleged to have sexually assaulted L.S., a female student who was 14 years old (9th grade), while on school grounds. The Douglas County District Court entered an order denying Jeremiah's motion to transfer his case to the juvenile court. Jeremiah appeals. We reverse and remand to the district court with directions to grant Jeremiah's motion to transfer his case to the juvenile court.

### BACKGROUND

An information was filed in the district court on December 26, 2023, charging Jeremiah with first degree sexual assault in violation of Neb. Rev. Stat. § 28-319(1)(a) (Reissue 2016), a Class II felony. A motion to transfer to juvenile court was filed on January 16, 2024, and a hearing was scheduled. Jeremiah requested and was granted a continuance of the hearing to allow for an

- 1 -

evaluation to be completed. A subsequent motion seeking more time for completion of the evaluation was granted and the transfer hearing was scheduled for September 18.

TRANSFER HEARING

At the hearing on September 18, 2024, the State offered the following exhibits: police reports; a juvenile intake summary prepared by probation; a transcript of Jeremiah's December 1, 2023, recorded interview; a January 26, 2024, memorandum prepared by juvenile probation (listing evaluations, service interventions, and placement options available in juvenile court); a document reflecting that Jeremiah had no arrest record; an "NCIC" national database document showing no criminal history; and a "disc" containing a forensic interview of L.S. and the recorded interview of Jeremiah. These exhibits were received without objection and no other evidence was offered by the State. A summary of that evidence follows.

STATE'S EVIDENCE

On December 1, 2023, at a high school in Omaha, Nebraska, L.S. reported she was sexually assaulted within the school "in the last 15 minutes." According to a police report's summary of L.S.' interview, which is generally consistent with L.S.' forensic interview video, the interview began at "1506 hours" and concluded at "1554 hours" on the day of the incident. L.S. reported that she and Jeremiah had been texting, and they were going to "'meet up cuz I knew him for a long long time now,'" and they were going to "hang out." L.S. said that she and Jeremiah were on their phones with different friends before going into another room. She said the room "was where people would go to chill out and make TikToks so she believed they were just going to 'chill, talk, and you know, not doing nothing important.'" She and Jeremiah had been talking since middle school and "they got closer but after what happened today she did not suspect he was the type of person to do that."

> After they met up as arranged, L.S. said that she
> "went into this corner, and he came up to me and physically moved me out of the corner, made me go in front of him, and then he like started bending me over, and then started basically dry humping me . . . after that he tried taking off my pants and I was like, 'ah were [sic] not doing this at school, and what are you doing? I don't want to do this' . . . and then after that he was like, 'this is what you was talking about [don't] be scared now.'"

L.S. told him she "'never wanted to do this, I don't know what you're trying . . . like, I never said I wanted to do this.'" She then said that he

> "forcibly like ben[t] me over and we started to get on the floor, he basically made me get on the floor, and then he put it in me . . . after that I told him to stop and he didn't listen, and I kept on telling him to stop and he didn't listen . . . I tried to get up . . . I'd say I tried to get up like five times, and he forcibly pinned me down on the floor so I couldn't get up until he was done."

L.S. said that "'when he was done, I got up, . . . I don't know if he nutted in me but I know he definitely nutted on the back of my pants . . . after that I looked at him and was like, "dude are you serious?" and then I walked out and then I started crying.'" L.S. said this was "unwanted" and that

she said "NO" several times. She said that Jeremiah's friend, G.G., was "in the area and should have heard her but did not come to help." L.S. went "into the restroom but . . . not . . . to clean up." L.S. called her best friend who told her to tell her mother, which she did. L.S. reported that she did not deserve to get "'treated like this, after all the things I did for him . . . [i]t makes me feel like, all boys are just going to use me for my body.'" She did not believe Jeremiah had ever done this before because "he had dated two of her friends in the past and they never said he had done this to them." L.S. acknowledged having "'sex one time'" before with someone else but she "'wanted to do it, so this [was her] first time actually getting sexually assaulted.'"

In G.G.'s interview, as summarized in a police report, he said that Jeremiah "'told me she agreed on it, that she wanted to do it.'" G.G. had just turned 15 years old at the time of the December 2023 incident. He said that after it happened, Jeremiah told him that L.S. wanted and agreed to it and that Jeremiah and L.S. "met there to do that." G.G. claimed he did not hear anything because he "had his Airpods in" and he did not see anything because "he kept walking up to the door to make sure no one was coming in." G.G. said that L.S. "never asked me for help." He said "he heard 'kissing.'" G.G. said that Jeremiah "told him that they had sex and told him that she agreed on it." G.G. said that Jeremiah had never done anything like this before.

After Jeremiah sat alone in an interview room for over 3 hours, a detective entered the room, gave Jeremiah his *Miranda* rights, and then commenced asking him about the incident. A police report's summary of Jeremiah's interview, along with the video of that interview, reveal the following. Jeremiah said that he and L.S., who he had known for a long time, agreed to "meeting up" and that they hung out at "'the spot.'" They were going to meet the next day, but he ended up not being at school. L.S. texted him again about meeting the following day. When they met, L.S. "started to talk freaky and gave him a hand job which resulted in him 'nutting' on her hand and the floor." He told L.S. that the hand job was "'trash.'" He believed L.S. claimed he raped her because of what he said. Jeremiah indicated that G.G. was sitting on the stairs and was "'looking out the door to see if anyone was coming.'" Jeremiah said he told G.G. that L.S. wanted to go to the room, so he asked G.G. to "'just watch the doors to make sure no one comes in'" and G.G. agreed and "no one came in the doors while they were there." Jeremiah eventually admitted that he and L.S. "'did have sex.'" He said that he and L.S. "were at the top of the steps kissing and hugging," that he made "'the suggestion,'" and that L.S. asked him if he was sure, and he said "'oh well, I guess.'" He then "pulled her pants down, she bent over," and they had sex. Jeremiah said L.S. never told him to stop; she did ask him about having a girlfriend, but he told her not to worry about her. Jeremiah said L.S. did not initially want "to do it at school but he told her they wouldn't get caught." He was "sorry about what happened because he shouldn't have done it at school." Jeremiah agreed that a mistake was made, but that "he stopped after [L.S.] said stop one and a half times." Jeremiah said he was "'not trying to make this weird'" but he was a teenager who "'watch[ed] porn,'" and "'in the porn they be like, 'oh stop, stop,' . . . and I didn't know she was meaning it in that way,'" so when "'she said I [(Jeremiah)] have . . . a girlfriend . . . and then she was like stop . . . I didn't realize too till I was done.'" As the interview was concluding, Jeremiah asked if he could talk to his mother. An approximately 20-minute break was taken, after which a DNA swab was taken from Jeremiah's mouth and the interview concluded.

A school video shows L.S., Jeremiah, and G.G. "in a hallway near where the incident happened at 1240 hours." They are out of sight until "1250 hours," when L.S. "comes out of the

stairwell (it appears her clothing is in disarray), walks into the bathroom for approximately 2 minutes, walks out of the bathroom to her locker on the second floor," and then walks to the dean's office to report the incident. Jeremiah and G.G. "walk the other way and down some stairs after the incident."

JEREMIAH'S EVIDENCE

The defense offered the following evidence without objection: a description of services for "Psychiatric Residential Treatment Facility (PRTF)," a "Student/Detainee Status Report" from the Douglas County Youth Center dated September 17, 2024 (indicating that Jeremiah "has become a role model to his peers on the unit," he is "respectful to staff and always willing to help around the unit," he "attends class everyday" but "doesn't seem too motivated to earn credits to graduate," his mother "has consistently visited him" and his grandmother has visited him twice); and the affidavit of a juvenile court coordinator with the public defender's office. The juvenile court coordinator had 23 years of experience in that position, working with families of juveniles subject to delinquency actions, as well as with attorneys representing those juveniles, prosecutors, and other officials and representatives from the juvenile court and other service providers. The coordinator affirmed that Jeremiah had no status or delinquency in the juvenile court's history. It was the coordinator's opinion that the juvenile court had numerous services available to Jeremiah, including programs for outpatient sexual offender specific treatment, a therapeutic group home for youth that sexually offend, a psychiatric residential treatment facility for youth that sexually offend, or a commitment to the Youth Rehabilitation Treatment Center ("YRTC").

The defense also offered exhibit 12, the December 4, 2014, deposition testimony of Dr. Colleen Conoley, from a separate case. The State objected, arguing that it was an "old deposition" and was not relevant to the present case. The district court noted that it was a different case, but that "she does talk about the science involved," so it received it for that purpose. The court also indicated that it would only be considered for "whatever relevance it has."

The defense offered without objection a forensic psycho-sexual evaluation report completed by a psychologist, dated August 12, 2024, along with her curriculum vitae and list of workshops and training. Jeremiah then called the psychologist who conducted his evaluation to testify on his behalf.

Dr. Kari R. Perez, a clinical and forensic psychologist, received a doctorate in clinical psychology with an emphasis in forensic psychology and child and family therapy in 2005. She has been licensed to practice in the field of psychology for 17 years. Prior to working in private practice, she was employed by the Nebraska State Penitentiary for 7 years. She was a clinical psychologist supervisor there and was responsible for "monitoring and supervising the mental health practitioners; developing programs for the sexual offenders and violent offenders; sitting on meetings where we assessed the needs for sexual offenders and violent offenders, their treatment needs and level of risk." She also did "Parole Board evaluations for sexual offenders and homicide offenders," and for "individuals that were being considered for work release and other activities that were more clinical." Prior to getting her license, she had an "internship with the Bureau of Prisons in Atlanta" where she did psychological evaluations of inmates, "monitored severely mentally ill inmates," and did competency evaluations. She has had "35 hours of training specific to juvenile sexual offending and about 45 specific to transfer hearings." She has participated in 25

- 4 -

criminal court cases and "about 150 or more" juvenile court cases, "a lot that were referred by probation for juvenile sex offender evaluations." She has always testified on behalf of the defendant but noted that out of 15 prior "transfer evaluations," there were 5 cases where she did not find the juvenile was amenable to treatment or where she gave an opinion that "their risk was so high that they were a risk to the community."

In Dr. Perez' evaluation of Jeremiah, she was asked to "assess his risk for potentially sexually reoffending, and also to consider his risk to the community, his treatment amenability, and his criminal sophistication or development and maturity as it relates to transfer." In reaching her conclusions, she relied on "police reports, court documents, video recordings, interviews with [Jeremiah], interviews with his mother, and some psychological testing and forensic assessments." She "spent about five hours interviewing him and another two hours doing psychological testing." In describing Jeremiah's demeanor during her sessions, Dr. Perez said that he was "generally cooperative" and "forthcoming with information," but that "[h]e did try to present himself in a very positive light" and "that became a concern later in the assessment process that was addressed." She described Jeremiah as coming from a "very supportive family." His mother was a "teen mother," but she is "very engaged" and she and Jeremiah "have a very close relationship and always have." He was "raised in St. Louis until he was about ten" and there "may have been some instability in residential and housing." Jeremiah's contact with his father was "pretty intermittent." Upon moving to Omaha when he was "about ten years old," Jeremiah initially lived with his grandmother, but there was "maybe a foreclosure or the owner of the home . . . wanted to sell the house or something," and "Mom ended up living in the car for a while" until she "got help from the Salvation Army and they helped her find an apartment." The "apartment complex did have some antisocial youth" living there who were "engaging in some delinquent activities." In

> ninth grade . . . he was affected more by it, because he had a cousin who was a couple years older than him that moved into their apartment with his mom, and . . . [Jeremiah] said [the cousin] was doing some things like stealing, but [Jeremiah] said that he didn't engage in any of those activities, because his mom would, quote, kill him if he did.

There was nothing that stood out in Jeremiah's medical or psychological history. There was no sexual, physical, or emotional abuse. Jeremiah had no psychiatric history, and other than "one instance of experimenting with marijuana with a peer," there were no problems with drugs or alcohol. Jeremiah had no prior juvenile court history, no prior arrests, no gang involvement, and no history of truancy -- other than "skipp[ing] some classes." Jeremiah had an individualized education program (IEP) and a multi-disciplinary treatment report that were reviewed by Dr. Perez. He was diagnosed with a learning disability in the 8th grade; he was "having these problems specifically with written expression and mathematics." There was some school history of disruptions in class, but his "cognitive testing and achievement testing show[ed] that he was in the average range on reading," and his "special education class teacher" described him as having "good social skills, to be likable." By high school, it was more "like a resource class."

Dr. Perez described Jeremiah as being of "average maturity for his age." As for "cognitive maturity, there's some immaturity there in the sense that he doesn't always weigh the consequences before he makes decisions." And when weighing "the pros and cons, he tends to put more weight on the benefits . . . than he does the consequences," which is "not atypical of

adolescents his age." As for "emotional maturity, he has a pretty good grasp of his anger control. He doesn't really have problems with emotional regulation. He has good interpersonal skills." She noted that with regard to the transfer evaluation, she looked at whether he was using that maturity to advance criminal objectives and "in that way is criminally sophisticated," but she "did not find that."

In one of the psychological assessment tests performed, Dr. Perez observed that Jeremiah "came out as trying to impression manage." He was "reporting a lot more virtuous types of behaviors than is typical of somebody his age." This did affect the validity of the test. After conducting "another test of clinical symptoms and personality traits and characteristics," there were no validity concerns. No "clinical symptoms or mental health concerns . . . stood out" on that test. Jeremiah's "profile was completely normal," he was "found to have good self-esteem," "good interpersonal skills," and "no mental health disorders." She did note that if Jeremiah were to get into treatment, "there may need to be some motivation intervening" because he "showed a little less treatment motivation than some of the youth who take the test who aren't engaging in treatment." (She clarified on cross-examination later that his treatment motivation is lower than other adolescents, like him, who were not engaged in a therapeutic setting at the time.) Jeremiah "lacked some insight into what needed changing," but he did say he was "open to making changes, and, . . . that he would participate in treatment if it was recommended for him."

In addition to the psychological assessments, Dr. Perez also did a "sexual reoffense risk assessment," which assumes that the crime was committed. She found Jeremiah to be "low to moderate in need for treatment intensity." She explained that "high would be a psychiatric residential treatment facility that focuses on sexual offending, whereas, moderate would be more like a therapeutic group home, and low would be, maybe intensive outpatient." Dr. Perez placed Jeremiah in the low to moderate range because "he has the resources to have a healthy sexual future in relationships," "[h]e has a positive family and supportive environment that believes it's important to have respectful sexual relationships," he had no "primarily deviant interests . . . like pedophilia or . . . sadomasochistic types of interests or exhibitionism." His frequency of pornography and "sexual thoughts and fantasies were pretty much average for a kid his age." He was able to "take feedback from others . . . which is important . . . if he was to go into treatment." Dr. Perez conducted a "violent offense risk assessment . . . a forensic assessment" called "SAVRY," that provides an "estimate of future violence risk." Jeremiah's risk was "[l]ow."

She discussed "adolescent sexual offenders," which Dr. Perez clarified included 12-year-olds to 18 or 19-year-olds; "sexual reoffense risk assessments that are normed on adults . . . are usually about age 18 and above." According to Dr. Perez, "what we know is that adolescent sexual offenders are very different in, like their thinking, in their attitudes, in, you know, the motivations for committing sexual offenses." "[T]he majority of adolescents who commit sexual offenses . . . do not have deviant sexual interests. It's more opportunistic. Sometimes it's curiosity or exploration." "[A]dolescents are developing constantly, so they're not as fixed [in their] attitudes or beliefs as they are in adults." Dr. Perez indicated that the rate of sexual reoffending in adolescents is "between 2.5 and 5 percent." "[I]f you make a risk prediction with an adolescent and you say that they are low, about 95 percent of the time, you will be correct." In her opinion, Jeremiah's risk prediction was "low." Dr. Perez opined that Jeremiah was amenable to treatment,

even though he was "currently asserting that he [was] innocent." That would "provide some complications." She explained,

> [I]f he is indeed convicted of this offense, they would engage with him on motivational interviewing to help him understand what the purpose of the treatment is and how treatment can benefit him. The other thing that we know is that even if he continued to deny or to say that . . . he is innocent, . . . that's not always a prerequisite for benefiting from treatment. There's a lot of research out there that says, in fact, that somebody who denies engaging in a sexual offense can still benefit and reduce their risk in a treatment setting, so that denial is not a risk factor in and of itself.

> He would be given a lot of other types of interventions . . . like victim empathy. He would engage in . . . interventions that would help him to reduce any kind of risk that he might have for reoffending. He would learn to . . . respect consensual relationships. He would learn how to gauge when somebody is interested in having sex with him or not, sort of sexual education. He would learn about a variety of things that we know reduce risk for sexual recidivism in adolescents.

According to Dr. Perez, the services she described were available in the juvenile court. She also discussed treatment options, such as a 6 to 8-month program in a therapeutic group home or possibly an intensive outpatient program if that was recommended by the group home. Dr. Perez believed that treatment for Jeremiah could be completed before he turned 19 years old. If the case remained in adult court and Jeremiah was sent to prison, Dr. Perez testified that there would be a treatment team who would make a decision about what level of treatment was needed. They have "bibliotherapy," which is like a "workbook where you do a lot of reading and writing" and meet with a therapist; "outpatient group therapy"; and "residential inpatient treatment." Dr. Perez thought Jeremiah would probably be recommended for bibliotherapy or no treatment, or if recommended for treatment, he might not get that treatment until later in his sentence when eligible for parole or release. She also described differences between adult probation and juvenile probation. "Juvenile probation would work more closely with the family" and "would have other services that would be available" if needed and deemed appropriate. There would be "more attention to his developmental needs as an adolescent."

Dr. Perez said it was "kind of hard to say" what led to this offense. Jeremiah was "uncomfortable talking about his sexual history, but he was generally forthcoming with information." "[H]e asserts that he's innocent, so his story doesn't really talk a lot about what was going on in his mind before he committed the . . . alleged offense." However,

> looking at the full picture . . . I think that he had watched some pornography, and that pornography had shown women who were saying no or stop, and -- but it was continuing. And so, he picked up from that that some women, you know, enjoy that or that that's okay. So, . . . that may have been one factor that was involved.

"Another is impulse control." "Another is . . . misunderstanding what the victim was saying and doing previously when he said that they were communicating about being up for whatever. And that . . . meant that she was interested in having sex with him." Also, "[p]oor decision-making . . . his willingness to have sex in school, whether it was consensual or not consensual, is problematic."

In Dr. Perez' opinion, she did not believe Jeremiah was a risk to the community, although "if you committed an offense, there's always a risk." She believed Jeremiah's risk to be low, but that did not mean he had "no risk."

On cross-examination by the State, Dr. Perez acknowledged that Jeremiah had "changed his story of what he told police happened." She said, "I believe he said he was nervous or that . . . he had been in there for a long time, so he was trying to say to them whatever they wanted to hear or what he thought would be best." She acknowledged that in the video recording of his interview, Jeremiah eventually admitted to sexual penetration occurring the way L.S. described it, "meaning the positioning of them on the floor at the school[,]" and that he admitted to "hearing her say 'no' several times before stopping." Dr. Perez agreed that the accountability that Jeremiah took through the law enforcement interview, "he kind of took back that accountability" when she interviewed him. Dr. Perez also agreed that if what L.S. said was correct -- in terms of the force used and being held down when trying to get up -- was not typical adolescent behavior. Dr. Perez explained that while "there is impulse control that is at play," and Jeremiah "misinterpreted what the intentions were of the victim when she agreed to meet him," that "things got out of control in his own mind." She stated that it was a "terrible thing that happened" and she did think it was "a problem." Dr. Perez did not necessarily construe G.G.'s presence "as being a lookout" so that Jeremiah "could rape this girl." But she acknowledged that G.G. knew that "some kind of sexual acts . . . were going to occur."

Dr. Perez agreed there were treatments available for Jeremiah in adult court, but she did not think they would be as beneficial as what he would receive if he was in the juvenile court system. She agreed that Dr. Conoley's deposition from 2014 discussed brain development continuing until approximately age 25 and acknowledged that juvenile court jurisdiction ends at age 19 before brain development is fully formed. She did not identify Jeremiah as having any "conduct disorder," "oppositional defiant disorder," "ADHD," "depressive disorder," or any "mental disorder . . . that would help describe why he engaged in this behavior." She did not have a "strong opinion" about why Jeremiah engaged in the alleged behavior because she "can't read his mind." Dr. Perez acknowledged that Jeremiah saw "little need for changes in his behavior."

The district court inquired further about the other student who was present during the incident. Dr. Perez agreed that if Jeremiah said he was there to watch the door so no one came in, he was "to some degree, standing watch." But she stated that it cannot be "automatically assume[d] that that means that no one came in so he could rape her." The court also inquired further about Dr. Perez' testimony regarding the recidivism rate of 12 to 19 years old being "quite a wide range." Dr. Perez noted that "kids who are 14 and younger" have victims "[q]uite a bit younger," while "15- or 16-year-olds are more likely to victimize kids that are . . . closer in age . . . as is the case here." She acknowledged that one of the therapeutic group homes she had discussed earlier generally required being age 13 or 14 to be involved.

POST-HEARING EVIDENCE

After Dr. Perez' testimony and in light of the district court's questions, defense counsel asked to present more information to the court about a group home option that had been discussed. The court told both parties they could "get additional information about programs for more specificity," as the "more information [the court] has, the better it is." The court stated that Dr.

- 8 -

Perez "didn't seem to be aware that there are specialists now in adult probation that deal with juveniles," so "if she wants to give me those things . . . whatever you have on programs is great." The court directed the parties to "get what you want, share it," and if they needed a hearing, to call and schedule one. The record reflects that exhibits 15 and 16 were subsequently marked and received into evidence.

Exhibit 15 is an affidavit from a juvenile court coordinator from the public defender's office clarifying that the noted therapeutic group home provided treatment for "males ages 13-18 years old who have demonstrated sexually abusive behaviors." That affidavit also identified two other treatment services for sexual offender treatment, one an "outpatient sexual offender specific treatment" in Omaha, and the other a "psychiatric residential treatment facility for youth that sexually offend" in Lincoln, Nebraska, that "works with teen males ages 14-18 years old who have engaged in sexual offenses." The Lincoln facility "addresses the treatment needs of male adolescents who have offended sexually."

Exhibit 16 was created by a specialized probation officer at the request of the county attorney's office. The probation officer was asked to provide information about what services would be available to a juvenile offender placed on adult probation. Although the author of the document did not have experience working with sex offenders, it was noted that adult probation has a unit of probation officers dedicated to working with individuals convicted of sex offenses. Programming offered by adult probation includes: cognitive programming, which is "standard for those being supervised at a high-risk level," and it includes moral reconation therapy, a 12-20 week program in a group setting, and dialectical behavioral therapy, which is held at the probation office; substance abuse programming; employment services; behavior change groups; and support groups. The probation officer added, "Regarding services for juveniles on adult probation, I am going to focus on those ages 16 and 17 and why this programming may not be appropriate for juveniles." The probation officer explained that while a juvenile can attend these programs, "it becomes a challenge" when the juvenile does not have a support system. "A lot [of] times, their support system becomes me." Juveniles "who participate in programming say they feel out of place and struggle to connect with others in the group. Juveniles are often still in school and trying to juggle the demands of their adult probation order, work, and manage peer pressure." "Becoming incarcerated is a traumatic event." "Nebraska Probation is ahead of many states when it comes to working with juveniles in the adult court system and offers excellent programming and services. With that said, if a youth can reasonably remain in the juvenile court and on juvenile probation they should. The programming offered by Juvenile Probation is designed for such."

DISTRICT COURT'S ORDER DENYING TRANSFER

On October 22, 2024, the district court entered an order denying Jeremiah's motion to transfer. The court summarized the allegations and the record as follows:

[Jeremiah] was 15 years old at the time of the allegations and is currently 16 years old. [Jeremiah] is charged with . . . first degree sexual assault. These charges arise from an incident occurring on December 1, 2023[,] during regular school hours at an Omaha high school attended by both [Jeremiah] and [the] victim. The victim of the homicide [sic] is listed as L.S. Exhibits indicate that L.S. reported the sexual assault immediately after it occurred to school administration and Omaha Police became involved. L.S. reports that

she and [Jeremiah] were in a room together and [Jeremiah] became aggressive. She indicates that a friend of [Jeremiah], G.G. was positioned as a look out to protect the assault from interruption. [Jeremiah] physically forced her to the ground and forced his penis into her vagina and ejaculated. She reported she attempted to scream for the other student without response and that she told [Jeremiah] to stop. She reported that she attempted to get up or away, however, [Jeremiah] forcefully restrained her and pulled her pants down to assault her.

G.G, a 15 year old student, admitted to law enforcement that he was present but denied participation. [Jeremiah] admitted to sexual intercourse and that L.S. did tell him to stop. [Jeremiah] stated he was attempting to mimic pornography he had seen.

. . . Dr. Perez indicated that [Jeremiah] had few behavior problems until the 9th grade when he became involved with an older cousin and was more exposed to trouble. . . . [Jeremiah] had an IEP in school based upon a specialized learning disability but it was not a behavioral IEP. [Dr. Perez] identified his behavioral referrals to not be significant or involve violence. [Jeremiah] had no medical history . . . relevant to the evaluation, no previous mental health treatment, and no history of abuse (sexual or physical) or trauma. . . . [Jeremiah] had no previous juvenile court involvement and no gang involvement. Dr. Perez concluded [Jeremiah] to be of average maturity for his age with some cognitive immaturity but not atypical for his age. Dr. Perez concludes [Jeremiah] is not "criminally sophisticated[,"] however, that conclusion is challenged by the State questioning [Jeremiah's] use of a look out and his multiple stories to law enforcement and [his] current refusal to accept responsibility. . . . Dr. Perez's conclusions, after testing and interviews, are that [Jeremiah] is amenable to treatment in the juvenile court and would benefit from that treatment. She finds [Jeremiah] is at a low risk to reoffend.

[Jeremiah] offered a deposition from Dr. Conoley regarding brain development and neurologic access to the prefrontal cortex in individual adolescents . . . . In summary, Dr. Conley [sic] concludes that the lack of complete development of the prefrontal cortex . . . challenges an adolescent's ability to tie consequences to their behaviors affecting their ability to regulate behavior, emotion, attention, judgment and impulse control.

The district court then briefly addressed each factor under Neb. Rev. Stat. § 43-276 (Cum. Supp. 2024), which it summarized in the following conclusion:

Certainly there are treatments available in the juvenile court that could help [Jeremiah] and to which he is amenable. There is very little evidence in the record of any criminal or antisocial behaviors of [Jeremiah] previous to this incident. He has no previous contacts with law enforcement or the juvenile court system. Dr. Perez believes the best interests of [Jeremiah] are best served by treatment. There is also evidence in the record that suggests [Jeremiah] did understand what he had done and that his behaviors were not solely impulsive, but were planned. There is evidence to suggest [Jeremiah] did understand right from wrong and that this was not exploratory, impulsive or opportunistic but rather planned.

The crimes charged involve violence. The motives for the offenses do not appear to be those involving mistake or misjudgment.

- 10 -

The Court does not find that treatment, therapy and rehabilitation addressing both the known and unknown issues with [Jeremiah] can be accomplished in a manner protecting public safety by the time [Jeremiah] reaches majority.

The Court is also asked to balance whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose. Based upon the nature of the charged crime and the degree of violence and personal control of the victim involved this Court cannot conclude with confidence that [Jeremiah] will not need to be in a secure detention facility or under supervision past his minority. The Court finds [Jeremiah] will likely need a longer period of supervision or secure detention than afforded through the juvenile court. Defendant's motion to transfer this case to the juvenile court is denied.

## ASSIGNMENTS OF ERROR

Jeremiah assigns that (1) the district court abused its discretion in denying his motion to transfer to juvenile court and that (2) the State offered insufficient evidence to justify retention of the case in adult court.

## STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## ANALYSIS

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. Neb. Rev. Stat. 29-1816(3)(c) (Cum. Supp. 2024) provides that "[a]n order granting or denying transfer of [a] case from county or district court to juvenile court shall be considered a final order for the purposes of appeal. Upon entry of an order, any party may appeal to the Court of Appeals within ten days."

### LEGAL FRAMEWORK

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against such juveniles may be initiated either in juvenile court or in the county or district court. The charged Class II felony places Jeremiah in the second category of juvenile offenders. The State elected to file charges against Jeremiah in the district court.

When considering whether to transfer a case, § 29-1816(3)(a) requires consideration of the following factors set forth in § 43-276(1):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of

any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a). "[F]actors that are considered 'neutral' or 'not applicable' are equivalent to factors that favor transfer because § 43-276 starts with the presumption that the case should be transferred." *State v. Aldana Cardenas*, 314 Neb. 544, 561, 990 N.W.2d 915, 928 (2023). The classification of certain factors as "neutral," "not applicable," or "weighing in favor of transfer" are better described as factors that do not support a sound basis for retention. See *id*.

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, "[i]t is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *Id*. "[I]n order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id*. "[T]he burden of proving a sound basis for retention lies with the State." *Id*. at 557, 990 N.W.2d at 926.

When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Hunt, supra*.

EVIDENCE DID NOT SUPPORT RETENTION IN DISTRICT COURT

Jeremiah's two assigned errors read together challenge the sufficiency of the State's evidence to support retention, and the district court's abuse of discretion in denying the transfer based on the evidence presented. We agree with Jeremiah that the State did not meet its burden of proving a sound basis for retention and therefore the district court abused its discretion by denying the transfer to juvenile court. See *State v. Aldana Cardenas, supra*.

As indicated above, a case "shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a). Section 43-276 "starts with the presumption that the case should be transferred." *State v. Aldana Cardenas*, 314 Neb. at

561, 990 N.W.2d at 928. And the burden of proving a sound basis for retention lies with the State. See *id*. When considering the factors set forth in § 43-276(1) as applied to this record, the factors primarily favor transfer, are neutral, or are not applicable, thus making them "factors that do not support a sound basis for retention." *State v. Aldana Cardenas*, 314 Neb. at 561, 990 N.W.2d at 928.

The district court acknowledged that there were "a number of treatments" available to Jeremiah but questioned whether Jeremiah could "successfully complete appropriate rehabilitative treatment in juvenile court" within the "limited time frame of the juvenile court." It noted Dr. Perez' testimony that Jeremiah's denial of responsibility "may increase the amount of time for treatment success." However, as pointed out by Jeremiah, Dr. Perez explained that if Jeremiah was in a 6 to 8-month program, "you would add . . . two to three months to that for the motivational interviewing," which she described as helping individuals who deny engaging in an offense to understand the purpose of treatment and how it can be a benefit. The district court's decision was based largely on its concern that Jeremiah "will likely need a longer period of supervision or secure detention than afforded through the juvenile court." However, our review of the record suggests otherwise.

Notably, the State put on no evidence that Jeremiah could not be adequately rehabilitated during his minority; he was 15 years old when he committed the offense in December 2023. By the time of the transfer hearing in September 2024, he had recently turned 16. The only evidence regarding whether Jeremiah could be rehabilitated before age 19 came from Dr. Perez, and she concluded there was sufficient time. Her report and testimony regarding rehabilitation observed that Jeremiah has many positive factors that favor giving him an opportunity to be rehabilitated under the juvenile court's supervision. Dr. Perez found Jeremiah to have "good self-esteem," "good interpersonal skills," and "no mental health disorders." In her sexual reoffense risk assessment of Jeremiah, she found him to be "low to moderate in need for treatment intensity," explaining that "he has the resources to have a healthy sexual future in relationships," "[h]e has a positive family and supportive environment that believes it's important to have respectful sexual relationships," he has no "primarily deviant interests," his frequency of pornography and "sexual thoughts and fantasies were pretty much average for a kid his age," and he is able to take feedback from others. She rated Jeremiah's risk in this area as "low." She opined that Jeremiah was amenable to treatment, even though he was "currently asserting that he [was] innocent." It was her opinion that treatment for Jeremiah could be completed before he turned 19 years old, and when comparing services and treatment between adult court and juvenile court, there would be "more attention to his developmental needs as an adolescent" in juvenile court.

Of significance, even the specialized probation officer's report (exhibit 16) offered by the State suggests that adult probation is not ideal for 16- and 17-year-olds under these circumstances. The probation officer pointed out that the adult cognitive programming "is standard for those being supervised at a high-risk level," but Jeremiah was identified as a low risk. There was also no suggestion of substance use issues, and employment was not really a factor for a 15-year-old. Further, "Behavior Change Groups" and "Support Groups" appear to be of limited availability and duration in adult probation. The probation officer stated, "I am going to focus on those ages 16 and 17 and why this [adult] programming may not be appropriate for juveniles." She explained that while a juvenile can attend adult probation programs, "it becomes a challenge" when the

juvenile does not have a support system. "A lot [of] times, their support system becomes me." Juveniles in adult facilities "who participate in programming say they feel out of place and struggle to connect with others in the group. Juveniles are often still in school and trying to juggle the demands of their adult probation order, work, and manage peer pressure." "Becoming incarcerated is a traumatic event." The State's witness concluded by observing:

> Nebraska Probation is ahead of many states when it comes to working with juveniles in the adult court system and offers excellent programming and services. With that said, if a youth can reasonably remain in the juvenile court and on juvenile probation they should. The programming offered by Juvenile Probation is designed for such.

The evidence received from Jeremiah, which was not rebutted by the State, clearly favored having this low-risk youth receive services designed especially for juvenile offenders through the juvenile court. In fact, the State's own witness explained why adult probation services in a case like this "may not be appropriate for juveniles." And, notably, there was no evidence to suggest that such treatment could not be completed prior to Jeremiah aging out of the juvenile court's jurisdiction.

The district court found that Jeremiah "stated he was attempting to mimic pornography he had seen," that he used a "look out," and he currently refused to accept responsibility. Jeremiah argues that the court abused its discretion "by drawing conclusions and relying on evidence that was not in the record," specifically noting the court's findings that Jeremiah "planned a sexual assault," made G.G. "aware the encounter was going to be a sexual assault," "recruited G.G. to be a lookout to accomplish a sexual assault," and that Jeremiah "reenacted a pornographic video or admitted to reenacting the same." Brief for appellant at 18.

We agree that it was not accurate for the district court to conclude that Jeremiah "was attempting to mimic pornography he had seen." The video of Jeremiah's interview does not support that conclusion. As explained by Jeremiah, he was a teenager who "'watch[ed] porn,'" and "'in the porn they be like, 'oh stop, stop,' . . . and I didn't know she was meaning it in that way,'" so when "'she said I [(Jeremiah)] have . . . a girlfriend . . . and then she was like stop . . . I didn't realize too till I was done.'" As further addressed by Dr. Perez, Jeremiah had "watched some pornography, and that pornography had shown women who were saying no or stop, and -- but it was continuing. And so, he picked up from that that some women . . . enjoy that or that that's okay." Although Jeremiah's excuse for not properly understanding L.S.' protests does not excuse his actions, his comments about pornography do not support the district court's finding that he was attempting to mimic pornography in his actions with L.S. The record also does not support the court's finding that L.S. "attempted to scream for the other student." L.S. did not claim this, nor did G.G. hear her call out to him. L.S. indicated that G.G. was sitting on the stairs nearby and she believed he could have heard her say "stop" and that she did not want "to do this." L.S. stated that G.G. was "just on his phone" and was not paying attention. G.G. stated that L.S. never asked him for help and that he only heard "kissing."

Also, the district court appears to have construed the evidence related to the "look out" situation as being planned for purposes of a sexual assault. While that is a possibility, there was also another possible explanation presented by the evidence. As observed by Dr. Perez, the fact that G.G. was asked to make sure no one entered the room did not necessarily mean that Jeremiah

- 14 -

intended to forcibly sexually assault L.S. She and Jeremiah both agreed about their plan to "meet up." To the extent Jeremiah and L.S. intended any type of consensual intimate or sexual contact while on school premises, it would have been understandable to have someone keeping a "look out" since this was a place where students tended to hang out. As L.S. stated, the room "was where people would go to chill out and make TikToks." Regardless of whether some or all of the actions that took place were consensual or nonconsensual, having G.G. sitting nearby on the stairs to keep a "look out" does not necessarily mean there was criminal intent. According to G.G., it was his understanding that Jeremiah and L.S. agreed to meet "to do that," that he heard "kissing," that L.S. "never asked me for help," and that Jeremiah had never done anything like this before. Even L.S. acknowledged her belief that Jeremiah had not ever done something like this before because "he had dated two of her friends in the past and they never said he had done this to them." Thus, while the evidence could have supported the court's conclusion that the "look out" was "to protect the assault from interruption," the evidence could also support that G.G. served as a "look out" to ensure privacy rather than to conceal criminal intentions.

The district court also appeared troubled by the fact that Jeremiah's version of what happened changed from what he initially reported to law enforcement to what he subsequently acknowledged. It is true that Jeremiah's story changed as his interview progressed, however, Dr. Perez testified as to why he might not have been immediately forthright, and this also was not rebutted by the State. As Dr. Perez stated, Jeremiah "said he was nervous," and he had "been in there for a long time" (as noted, he waited alone over 3 hours in a small interview room before the detective entered to commence questioning), and "so he was trying to say to them whatever they wanted to hear or what he thought would be best." She noted that Jeremiah ultimately acknowledged sexual penetration as described by L.S. and that he heard her say "no" several times before stopping. She did not find Jeremiah to have problems with emotional regulation, nor did she find him to be using his "maturity to advance criminal objectives." Although Jeremiah initially tried to "impression manage," and Dr. Perez thought he might need "some motivation intervening," she nevertheless concluded that Jeremiah was open to making changes and would participate in recommended treatment.

Sexual assault is a serious offense, and we can appreciate the district court's concern about the severity of the crime charged. However, the Legislature did not exclude serious offenses from being retained in or transferred to the juvenile court. As set forth previously, § 43-246.01(3) specifically grants the juvenile court concurrent jurisdiction with the county or district court over juvenile offenders who are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Thus, the Legislature did not exclude serious offenses such as sexual assault from being eligible for retention in or transfer to the juvenile court. Instead, it provided numerous factors to be considered when determining whether a juvenile should be tried in adult court or juvenile court. Section 43-276(1) sets forth 15 factors to be considered in making such a decision. "[T]here are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *State v. Hunt*, 299 Neb. 573, 582, 909 N.W.2d 363, 371 (2018).

The Nebraska Supreme Court has held that when conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile. *In re Interest of Steven S.*, 299 Neb. 447, 908

N.W.2d 391 (2018). And as this court has previously stated, a "trial court must balance a juvenile's amenability to complete rehabilitation by age 19 against the public's safety in the event that rehabilitation fails or requires more time than anticipated." *State v. Leroux*, 26 Neb. App. 76, 118, 916 N.W.2d 903, 929 (2018). "The trial court's decision carries the consequence that if the decision is wrongly made, we have either missed an opportunity to rehabilitate a juvenile outside the negative influences of adult incarceration or failed to adequately incarcerate a potentially dangerous juvenile who will go on to commit further violent crimes." *Id.*

While this case involves a serious offense, considerable evidence was presented to indicate that numerous services are available for Jeremiah in the juvenile court system and that his rehabilitation should be "nonproblematical." *In re Interest of Steven S., supra.* Jeremiah has no prior juvenile or criminal history, and a forensic assessment that estimates an individual's future violence risk determined Jeremiah's risk to be "low." While Jeremiah's behavior in this instance was problematic, neither L.S. nor G.G. were aware of Jeremiah ever behaving in such a manner previously. Dr. Perez testified that Jeremiah would be given various types of interventions to help reduce the risk that he might reoffend, such as victim empathy, and learning to respect consensual relationships and "how to gauge when somebody is interested in having sex with him or not." As noted by Dr. Perez, adolescent sexual offenders "are very different in . . . their thinking, in their attitudes, in . . . the motivations for committing sexual offenses . . . [they] do not have deviant sexual interests." Further, adolescents "are developing constantly, so they're not as fixed [in their] attitudes or beliefs as they are in adults." Dr. Perez also explained that the rate of sexual reoffending in adolescents is "between 2.5 and 5 percent." This meant that when a risk prediction was "low," as it was with Jeremiah, then "about 95 percent of the time, you will be correct." Based on this evidence, which was not contradicted by the State, any risk of Jeremiah sexually reoffending and being a risk to the public was extremely low.

Further, there is also substantial evidence in the record to establish that Jeremiah is amenable to rehabilitation in the juvenile court and that this could be accomplished before Jeremiah turns 19. The September 17, 2024, report from the Douglas County Youth Center indicated that Jeremiah "attends class everyday," and had "become a role model to his peers on the unit," and was "respectful to staff and always willing to help around the unit." The juvenile court coordinator for the public defender's office, who had two decades of experience in that role, opined that the juvenile court had numerous services available to Jeremiah, including programs for outpatient sexual offender specific treatment, a therapeutic group home for youth who sexually offended, a psychiatric residential treatment facility for youth who sexually offend, or a commitment to the YRTC. The specialized probation officer who submitted a document on behalf of the State, reported that while there were programs offered by adult probation for individuals convicted of sex offenses, she explained why that programming "may not be appropriate for juveniles" ages 16 and 17. In her opinion, "[I]f a youth can reasonably remain in the juvenile court and on juvenile probation they should. The programming offered by Juvenile Probation is designed for such."

When weighing public protection and societal security against Jeremiah's ability to successfully achieve rehabilitation in a practical and nonproblematical manner while under the age of 19, we conclude that the evidence in this record favors the latter. Other than offering the exhibits as described earlier, the State offered no expert or other testimony regarding public protection and

societal security being a significant concern in this case, nor did it adduce evidence to indicate that Jeremiah could not be successfully rehabilitated while under the juvenile court's jurisdiction. To the contrary, the evidence supported numerous options for services and treatments in the juvenile court, as well as supported that Jeremiah would be cooperative in that process. Accordingly, based on the record presented, we conclude that the district court abused its discretion in denying Jeremiah's request to transfer his case to the juvenile court.

CONCLUSION

For the foregoing reasons, we reverse and remand with directions to the district court to sustain Jeremiah's motion to transfer his case to the juvenile court.

REVERSED AND REMANDED WITH DIRECTIONS.